ACCEPTED
02-15-00204-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
11/9/2015 9:08:51 PM
DEBRA SPISAK
CLERK

No. 02-14- 00204-CV

COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS
FORT WORTH DIVISION

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
11/9/2015 9:08:51 PM
DEBRA SPISAK
Clerk

FREDDIE L. SHELLNUT

V.

WELLS FARGO BANK, NA, et al.

On Appeal from Cause No. 096-264305-13
96th Judicial District of Tarrant County, Texas
the Honorable R.H. Wallace, Jr. presiding.

APPELLANT'S BRIEF

Caleb Moore
Texas Bar No. 24067779

**Law Firm of Caleb Moore, PLLC**
2205 Martin Drive, Ste. 200
Bedford, TX 76021
Telephone: (682) 521-5002
Facsimile:   (817) 581-2540
Email: cmoore@thedfwlawfirm.com

Attorney on Appeal for Freddie Shellnut

Appellant requests oral argument.

Page **1** of **63**

**No. 02-14- 00204-CV**

FREDDIE L. SHELLNUT,

Appellant,

V.

WELLS FARGO BANK, NA, et al.,

Appellee.

---

Identity of Parties and Counsel

---

**Appellant:** **Freddie Shellnut, Plaintiff**

Trial Counsel: Caleb Moore
2205 Martin Drive, Suite 200
Bedford, Texas 76021

Appellant Counsel: Caleb Moore
2205 Martin Drive, Suite 200
Bedford, Texas 76021

**Appellee:** **Wells Fargo Bank, NA, Defendant**

Trial Counsel: Robert T. Mowrey
Locke Lord
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201

Appellate Counsel: Thomas F. Loose
Mathew Davis
Locke Lord
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201

## TABLE OF CONTENTS

Identity of Parties and Counsel ……..……………………………….….…2

Table of Contents ………………………..…………………………….…..3

Index of Authorities ………………….….…………………………….…..4

Statement of the Case ………………..…………………………………8

Issues Presented ……………………………………………………………9

Statement of the Facts ……………….……………………………………10

Summary of the Argument ………………..…………………………..…20

Standard of Review ……………………………………………….……23

Argument ………………………………..………………………….……26

    A. Wells Fargo Failed to Establish as a Matter of Law that the Statute of Frauds Bars Shellnut's Claims for Breach of Contract, Fraud, TDCA, or Negligent Misrepresentation………………………………………..…….26
        1. Breach of Contract—Shellnut's summary judgment evidence establishes, at a minimum, disputed issues of material fact exist regarding who was the first party to materially breach the loan agreements and statute of frauds is irrelevant to this issue…………………………………………………….28
            a. Fair Notice Pleading……………………………..…….27
            b. Disputed Material Facts…….……………………………..29
        2. The Statute of Frauds is inapplicable to Shellnut's Fraud Claim.…38
        3. The Statute of Frauds is inapplicable to Shellnut's TDCA Claim…43
        4. The Statute of Frauds is inapplicable to Shellnut's Negligent Misrepresentation Claim……………………………………………44
    B. Wells Fargo Fails to Establish as a Matter of Law that the Economic Loss Rule Bars Shellnut's Claims for Fraud, TDCA, or Negligent Misrepresentation……………………………………………………46
        1. Fraud and TDCA—Economic Loss Rule…………………......49
        2. Negligent Misrepresentation…………………………………..56

a. The negligent misrepresentations shown in the summary judgment evidence were based on duties not created by contract and caused economic and non-economic harm……………….56

b. Wells Fargo failed to conclusively negate one or more elements of Shellnut's negligent misrepresentation claim and genuine issues of material fact exist………………………..…………57

C. The Trial Court abused its discretion in denying Shellnut's First Amended Second Motion to Compel Production of Documents and Interrogatory Responses and in Granting, in part, Wells Fargo's Request for a Protective Order……………………………………………………………..59

Conclusion and Prayer …………………………………………………………..62

---

## INDEX OF AUTHORITIES

CASES:

*20801, Inc. v. Parker*,
    249 S.W.3d 494 (Tex. 2010)……………………………………………23
*Abraxas Petroleum Corp. v. Hornburg*,
    20 S.W.3d 741, 758 (Tex. App.—El Paso 2000, no pet.)………………..29
*Austin v. Countrywide Homes Loans*,
    261 S.W.3d 68 (Tex. App.—Houston [1st Dist.] 2008, pet. denied)………25
*Billstrom v. Mem'l Med. Ctr.*,
    598 S.W.2d 642, 647 (Tex. Civ. App.—Corpus Christi 1980)……………28
*Burnette v. Wells Fargo Bank, N.A.*,
    4:09-CV-370, 2010 WL 1026968, at *7 (E.D. Tex. Feb. 16, 2010)………58
*Boyles v. Kerr,*
    855 S.W.2d 593, 601 (Tex.1993)………………………………………27
*Broom v. Brookshire Bros., Inc.,*
    923 S.W.2d 57, 60 (Tex. App.—Tyler 1995, writ denied)………………..27
*Case Corp. v. Hi-Class Bus. Sys. Of Am., Inc.,*
    184 S.W.3d 760, 769–70 (Tex. App.—Dallas 2005, pet. denied)…………29
*Centeq Realty, Inc. v. Siegler*,
    899 S.W.2d 195 (Tex. 1995)……………………………………………24
*Chau v. Riddle*,
    254 S.W.3d 453 (Tex. 2008)……………………………………………24
*Chavez v. Wells Fargo Bank, N.A.,*
    578 Fed. Appx. 345, 348 (5th Cir. 2014)………………………………55
*Cire v. Cummings,*

      134 S.W.3d 835, 838–39 (Tex. 2004)…………………………………………25

*Citizens Nat'l Bank v. Allen Rae Investments, Inc.*,
      142 S.W.3d 459, 477 (Tex. App.—Fort Worth 2004, no pet.)………41, 56

*City of Houston v. Clear Creek Basin Auth.*,
      589 S.W.2d 671 (Tex. 1979)………………………………………………24

*Coker v. Coker*,
      650 S.W.2d 391, 393 (Tex. 1983)…………………………………………31

*Cont'l Dredging, Inc. v. De–Kaizered, Inc.*,
      120 S.W.3d 380, 394–95 (Tex. App.—Texarkana 2003, pet. denied)…….29

*Deuley v. Chase Home Finance LLC*,
      CIV.A. H-05-04253, 2006 WL 1155230 (S.D. Tex. Apr. 26, 2006)…….42

*Dozier v. AMR Corp.*,
      2-09-186-CV, 2010 WL 3075633 (Tex. App.—Fort Worth Aug. 5, 2010, no pet.)……………………………………………………………………………25

*Elliot-Williams Co. v. Diaz*,
      9 S.W.3d 801 (Tex. 1999)………………………………………………23

*EMC Mortg. Corp. v. Jones*,
      252 S.W.3d 857, 869–70 (Tex. App.—Dallas 2008, no pet.)……………54

*Fed. Land Bank Ass'n of Tyler v. Sloane*,
      825 S.W.2d 439 (Tex. 1991)…………………………………45, 56, 58

*Formosa Plastics Corp. USA v. Presidio Engineers and Contractors Inc.*,
      960 S.W.2d 41, 45 (Tex. 1998)…………………………………46, 49, 51

*Fort Worth Star-Telegram v. Street*,
      61 S.W.3d 704 (Tex. App.—Fort Worth 2001, pet. denied)………….23, 24

*Frost Nat'l Bank v. Fernandez*,
      315 S.W.3d 494 (Tex. 2010)……………………………………………..24

*Gupta v. Eastern Idaho Tumor Institute, Inc.*,
      140 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)…………………………………………………………………30, 31

*Haase v. Glazner*,
      62 S.W.3d 795 (Tex. 2001)…………………………………..………..26

*Hanks v. GAB Bus. Servs., Inc.*,
      644 S.W.2d 707, 708 (Tex. 1982)………………………………………..31

*Heil Co. v. Polar Corp.*,
      191 S.W.3d 805 (Tex. App.—Fort Worth 2006, pet. denied)…………..51, 52

*Henry v. Masson*,
      333 S.W.2d 825, 835 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)…..……………………………………………………………...29, 30

*Horizon v. Auld,*
      34 S.W.3d 887, 897 (Tex. 2000). ………………………………..…..27

*In re B.I.V.*,
    870 S.W.2d 12, 13 (Tex. 1994)……………………………………………28

*Joe v. Two Thirty Nine Joint Venture*,
    145 S.W.3d 150 (Tex. 2004)……………………………………………25

*Kruse v. Bank of New York Mellon*,
    936 F. Supp. 2d 790 (2013)…………………………………………43, 44

*Long Trusts v. Griffin*,
    222 S.W.3d 412, 415–16 (Tex. 2007)…………………………………31

*Maginn v. Norwest Mortgage, Inc.*,
    919 S.W.2d 164 (Tex. App.—Austin 1996, no writ)………………44, 45

*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*,
    280 S.W.3d 844 (Tex. 2009)……………………………………………23

*McCaig v. Wells Fargo Bank (Texas), N.A.*,
    788 F.3d 463 (5th Cir. 2015)……………………………………44, 50, 52

*McConnell v. Southside Indep. Sch. Dist.*,
    858 S.W.2d 337 (Tex. 1993)……………………………………………24

*McDaniel v. JPMorgan Chase Bank*,
    No. 1:12-CV-392, 2012 WL 6114944 (E.D. Tex. Dec. 10, 2012)………..52

*Medina v. Herrera*,
    927 S.W.2d 597, 602 (Tex. 1996)……………………………………28

*Natividad v. Alexsis, Inc.*,
    875 S.W.2d 695, 699 (Tex. 1994)……………………………………28

*Nixon v. Mr. Property Mgmt. Co.*,
    690 S.W.2d 546 (Tex. 1985)……………………………………………23

*Owens-Corning Fiberglass Corp. v. Malone*,
    972 S.W.2d 35 (Tex. 1998)……………………………………………25

*Perez v. Embree Const. Group, Inc.*,
    228 S.W.3d 875, 883 (Tex. App.—Austin 2007, pet. denied)………..……25

*Rivera v. Bank of America, N.A.*,
    No. 4:13-CV-195, 2014 WL 2996159, at *7 (E.D. Tex. July 3, 2014)...56, 57

*Sw. Bell Tele. Co. v. Delanney*,
    809 S.W.2d 493, 494 (Tex. 1991)……………………………………46

*Tex. State Dep't of Corrs. v. Herring*,
    513 S.W.2d 6, 9–10 (Tex. 1974)……………………………………..28

*Travelers Ins. Co. v. Joachim*,
    315 S.W.3d 860 (Tex. 2010)……………………………………………23

*Waterfield Mortg. Co., Inc. v. Rodriguez*,
    929 S.W.2d 641, 644 (Tex. App.—San Antonio 1996, no writ)…………..44

STATUTES:

TEX. BUS. & COM. CODE § 2.201…………………………………………………….26

TEX. BUS. & COM. CODE § 26.01……………………………………………………26

TEXAS RULES OF CIVIL PROCEDURE 166a(b), (c)…………………………………24

## STATEMENT OF THE CASE

*Nature of the Case:*    Appellant Shellnut sued Appellees Wells Fargo and U.S. National Bank Association for negligent misrepresentation, unfair debt collection practices, breach of contract, and fraud. (CR 5) Appellees filed a Traditional Motion for Summary Judgment on all of Appellant's claims. (CR 341)

*Trial Court:*    96th District Court of Tarrant County, the Honorable R.H. Wallace, Jr. presiding.

*Disposition in the*
*Trial Court:*    On February 4, 2015, the trial court granted Appellees' Motion for Summary Judgment dismissing all of Appellant's claims and ordered that Appellant take nothing. (CR 630) On April 30, 2015, the trial court granted Appellees' Motion to Dismiss Counterclaim without Prejudice and Final Judgment. (CR 646) Appellant filed the Notice of Appeal on June 24, 2015. (CR 662)

*Parties in the Court*
*of Appeals:*    Appellants: Plaintiff, Freddie L. Shellnut

Appellees: Defendants, Wells Fargo Bank, NA, d/b/a America's Servicing Company; US Bank National Assoc., as Trustee for Credit Suisse First Boston Mortgage Securities Corp., Home Equity Asset Trust 2006-7, Home Equity Pass-Through Certificate.

Did the trial court err in granting summary judgment?

Sub-Issue 1: The trial court erred in granting summary judgment on the breach of contract claim. Wells Fargo failed to establish that Shellnut was the first party to breach the contract. Second, Shellnut presented more than a scintilla of evidence that raised genuine issues of material fact as to whether Wells Fargo breached the contract. Accordingly, the summary judgment on breach of contract should be reversed, and the case should be remanded for further proceedings in the trial court.

Sub-Issue 2: The trial court erred in granting summary judgment because Wells Fargo failed to establish as a matter of law that the statute of frauds barred Shellnut's claims. Alternatively, Shellnut presented more than a scintilla of evidence that raised genuine issues of material fact as to whether the statute of frauds applied to their claims. Accordingly, the summary judgment on the affirmative defense of statute of frauds should be reversed, and the case should be remanded for further proceedings in the trial court.

Sub-Issue 3: The trial court erred in granting summary judgment on Shellnut's tort claims. First, as a matter of law, Defendant did not present sufficient summary judgment evidence establishing that the economic loss rule bars Shellnut's negligent misrepresentation or fraud claims as a matter of law. Second, Shellnut presented more than a scintilla of evidence that raised genuine issues of material fact on the elements of each claim. Third, the existence of a written contract does not bar Shellnut's negligent misrepresentation claim as a matter of law. Accordingly, the summary judgment on Shellnut's tort claims should be reversed, and the case should be remanded for further proceedings in the trial court.

Sub-Issue 4: The trial court erred in denying Appellant's motion to compel the production of documents

**Facts Related to the Contractual Agreements (Loan Documents)**

The Note (CR 498–502) and the Texas Home Equity Security Instrument (CR 503–21) provide the following key rights and duties agreed to between the parties.

### Note—Plaintiff's Exhibit 2

Shellnut has the right to repay his loan in monthly installments of $1,372.86 and is required to make each monthly payment until the loan matures. (CR 498–99).

Shellnut and Note Holder, here Wells Fargo, agreed that if Shellnut failed to pay a monthly payment Shellnut would be in default and the Note Holder could send a written notice stating that if the overdue amount was not paid by a date certain at least thirty (30) days after the date of the notice, the Note Holder could accelerate the full amount due. If the Note Holder has elected to send that notice, the Note Holder has the right to be paid back its costs and expenses in enforcing the Note, including reasonable attorney fees. (CR 499–500).

Any notice must be given by regular or certified mail. (CR 500).

Shellnut and Note Holder agreed that Shellnut had no personal liability for the repayment of the Note and that if the Note was not repaid the Note Holder could enforce its right to repayment solely against the Property. (CR 500).

**Security Instrument—Plaintiff's Exhibit 3**

Shellnut gave Lender a security interest in his homestead, subject to the provisions in the Security Instrument and Note. (CR 503–21).

Shellnut has the contractual right, even after a default, to reinstate his account up and until the earliest of five (5) days before a posted sale date, any other period that applicable law might state his right to reinstate ends, or the entry of a judgment enforcing the security interest. (CR 513).

To reinstate, Shellnut must cure any defaults of any covenant or agreement, pay all expenses which are allowed by Section 50(a)(6), Article XVI of the Texas Constitution, incurred in enforcing the security instrument, including but not limited to reasonable attorney fees, property inspection and valuation fees and other fees incurred for the purpose of protecting Lender's interest. (CR 513).

If Wells Fargo determined that any part of the Property was subject to a lien which can attain priority over the security Instrument that it **may** give borrower notice identifying the lien triggering Shellnut's obligation to cure the issue as stated in § 4 within ten days of the date the notice was given. (CR 507)

Shellnut's agreement with Lender to grant Lender a security interest in his Property was expressly limited to and intended to comply with Section 50(a)(6), Article XVI of the Texas Constitution and the parties agreed that any provision in the Note or Security Instrument should be corrected, if needed, to comply with the

above section of the Texas Constitution.  (CR 514).

**Facts Regarding the Loan, Servicing, and Loss Mitigation**

Shellnut is the current record owner of the property located at 7604 Westwind Drive, Fort Worth, Texas 76179 (Property).  (CR 498–502).  On or about February 17, 2006, Shellnut obtained a home equity loan from Aames Funding Corporation DBA Aames Home Loan, for $192,000.00.  (CR 498). Beginning in approximately January 2010, Shellnut began to struggle to pay his mortgage payments due to family medical expenses and a reduction in income. (CR 494).  However, Shellnut made payments on the loan until approximately January 2011, at which time Shellnut quit sending payments.  (CR 494).

Beginning in early 2010 and continuing throughout that year, Shellnut reached out several times to American Servicing Company (ASC), who had taken over servicing Shellnut's loan, to determine the outstanding balance and any options the company could provide in getting caught up on or lowering his payments.  (CR 494–95).  ASC encouraged Shellnut to take part in their Borrower's Counseling Program, and the Loss Mitigation Department sent Shellnut a letter stating that he needed to complete an application to be considered for options such as a repayment plan, loan modification, partial claim, pre-foreclosure sale, and deed in lieu of foreclosure.  (CR 495).  Shellnut sent in the application and the financial records requested and followed up with Wells Fargo

over the phone regarding the status of his modification. (CR 495). Throughout 2010, Shellnut was given various reports, both in writing and over the phone, when he called, regarding the status of his loan modification application, including that he was in underwriting, that the application was under review for a loan modification, that the review revealed he needed to send updated financial information, and other similar explanations explaining Wells Fargo's delay in approving or denying the application. (CR 495). During this, Shellnut continued to send payments. (CR 495).

In 2011, Shellnut attempted to get a verified reinstatement figure and confirmation that when paid, ASC would reinstate the loan; however, Barret, Daffin, Frappier, Turner and Engel, LLP, (Barret Daffin) ASC's foreclosure attorney and ASC both refused. (CR 496–96). Shellnut attempted to get out of the loan modification process but when ASC and Barrett Daffin refused, Shellnut believed he had no choice but to wait for the loan modification process to conclude. (CR 496). As such, he continued to send in requested documents, applications, and financial records requested throughout 2011 and into 2012. (CR 495–96, 553–56).

Shellnut called ASC on multiple occasions trying to get confirmation that his loan would be reinstated if he paid. (CR 495–96). Plaintiff's Exhibit 12 includes a transcript of examples of some of the recorded calls produced by Wells Fargo and

Shellnut incorporates the examples by reference and the entire exhibit as being relied on in support of the response to summary judgment. Of note the following exchanges are particularly relevant:

(CR 570)

**MR. SHELLNUT: Says, The above figures were provided by our client and are subject to final verification. Our client reserves the right to collect additional amounts as necessary to complete the reinstatement.**

**WELLS FARGO REPRESENTATIVE: Correct. So what that means is that foreclosure fees can be assessed daily, so by the time you make the payment, there could be some outstanding fees. So once you pay the amount that's quoted on the reinstatement figure by the time frame that's given on the reinstatement notice, then at that point the account would be brought out of foreclosure.**

(CR 562)

**MR. SHELLNUT: You're saying I can't make a payment, is that what you're saying -- telling me?**

**WELLS FARGO REPRESENTATIVE: At this time I wouldn't be able to accept the payment since it was active foreclosure, but you can certainly contact the foreclosure attorneys if you're wanting to reinstate the loan by paying the total amount due. Otherwise, if you're not able to do that, you know, we -- we are reviewing you for modification options at this point. It looks like the loan is active for that. So if we are able to get you set up on some kind of a plan with us --**

Shellnut was not told until August 2012 that his loan was not eligible to be

modified because the investor declined. (CR 496, 555–56). Barrett Daffin provided Shellnut with only a total loan amount of $201,662.12 and stated that it did not include additional fees and charges. (CR 587).

**Evidence of Account Discrepancies/Errors**

On May 23, 2010, ASC stated Shellnut's total past due amount was $2,436.92; on June 11, 2010, ASC claimed in the proposed "Loan Modification Agreement" that $13,198.07 was the past due amount; on August 15, 2010, ASC claimed $2,795.76 was the total past due. (CR 581–86). On June 15, 2010, account log shows Shellnut was told total due $3,824.80. (CR 591). On March 20, 2011, claimed total amount owed $2,903.04. (CR 589–90).

ASC's records show Shellnut at a minimum made payments through January 2011. (*Compare* CR 524 and 532–43). On May 13, 2011, Barrett Daffin sent the acceleration notice and claimed the total due on Shellnut's account was $201,662.12, which includes approximately $19,000.00 in unexplained fees, claimed advances not including principal and could not include more than three months of unpaid interest. (CR 587). As of May 25, 2011, estimated full reinstatement amount provided to Shellnut was $8,133.30. (CR 588). On May 24, 2011, the reinstatement quote sent states $11,331.83 is due, with that amount consisting of $0.00 in attorney fees. (CR 592).

The total amount Tarrant County was paid for taxes on the Property for

2009, 2010, and 2011 was $10,010.72. (CR 545). This is $486.77 more than was actually due for the time period. Wells Fargo claims to have advanced $12,119.43 in county taxes from January 2010 through November 2011, approximately $2,000.00 more than Tarrant County has been paid. (CR 594). The payment claimed to have been made in the amount of $2,595.48 does not match any of the amounts Tarrant County reflects was paid. (CR 594).

Wells Fargo claims Shellnut owes reimbursement for advanced homeowner's insurance payments totaling $4,675.48; title, inspection, Broker Price Opinion (BPO), and title related fees in the amount of $1,086.57. (CR 593–95).

Of note, no written notice was ever sent to Shellnut stating that Wells Fargo was going to pay taxes or insurance on his behalf. Nor was there any evidence that Shellnut was past due on his taxes or that the County was seeking to collect taxes from Shellnut.

**Additional Evidence in Support of Plaintiff's Tort Claims**

On February 9, 2010, Wells Fargo knew the investor guidelines would not allow a rate change, an extended maturity date more than ten months past current maturity date; yet continued to call and solicit Shellnut for financial information to attempt "modification." (CR 597). These limitations to what could be modified had nothing to do with any financial information provided by Shellnut as Wells

Fargo's records show as of February 16, 2010, Shellnut had not provided any financial information. (CR 612).

On June 8, 2010, Wells Fargo knew the investor on Shellnut's loan would not reduce the interest rate, extend the maturity date beyond ten months past the current maturity date, and could not reduce the monthly payment. (CR 596). It is Wells Fargo's policy to send a modification application to every customer who calls inquiring about loan modification and advises that customer to submit financial information and apply for a loan modification (CR 600). Wells Fargo has no screening process to identify those loans that cannot be modified. (CR 600). Wells Fargo cannot confirm that a loss mitigation department capable of accepting or denying Shellnut's application for modification existed when he started the process and Wells Fargo does not know at what point such a department came into existence. (CR 601).

At the latest, June 8, 2010, is the date Wells Fargo knew that Shellnut's loan was ineligible for modification. (CR 602). Wells Fargo knew that the assistance Shellnut was repeatedly applying for was a reduced monthly payment, but it doesn't know if it ever told him his loan was not eligible for that type of assistance. (CR 603). Wells Fargo is unable to determine if anyone with a Texas Cash Out Loan, including Shellnut, was ever eligible for a reduced payment plan as it does not keep records or documents reflecting what was available for modification of

Texas Cash Out loans at any particular time from 2010–2014. (CR 603–04).

Wells Fargo says that Shellnut was told "upfront" in 2012 that Wells Fargo only offered repayment plans on Texas Cash Out loan and they are only offered during the first 6 months past when a borrower misses a payment, "upfront" is more than two years after Wells Fargo knew. (CR 6005). Wells Fargo doesn't know when that policy went into effect or what the policy was in 2010 and cannot identify any way to determine that information. (CR 605–06). Wells Fargo's representative, Ms. Bosier, simply trusts that whatever the policies and procedures were in 2010 that **"they would have had all the–all the policies and procedures for loss mitigation reviews in front of them while they were doing a review on this loan."** (CR 606). Ms. Bosier trusts that the unknown or identified checks and balances and that the unknown policies and procedures were being followed because of the unknown training given to each representative for their specific job by Wells Fargo. (CR 606). Any time a borrower contacts Wells Fargo requesting help, Wells Fargo sends the borrower a loss mitigation application and requests the borrower send in financial information to be reviewed for loan modification, even if previously the borrower was reviewed and determined to be ineligible. (CR 607). Wells Fargo has determined it is not appropriate to tell a borrower that he ineligible for the requested assistance when that determination was made. (607–08). Waiting two years to tell an ineligible borrower about the ineligibility is

completely appropriate to Wells Fargo and in line with its current policies and procedures. (CR 607–08).

Wells Fargo claims Shellnut might have been eligible for a loan modification with reduced payments in 2010, but no one at Wells Fargo is able to identify the type of modification for which Shellnut's loan was eligible. (CR 609). Upon reviewing the file in preparation for the deposition, Wells Fargo did not see anything that was incorrect or handled in a way that went against its policies and procedures. (CR 610). In approximately ten (10) years with Wells Fargo, part of which was spent working specifically with Texas Cash Out loans, this corporate representative could not recall a Texas Cash Out loan ever being modified by Wells Fargo. (CR 599, 611).

On December 18, 2014, Defendants filed an Amended Traditional Motion for Summary Judgment on all of Shellnut's claims. (CR 341-42). On February 4, 2015, the trial court rendered summary judgment on all of Shellnut's claims in this case. Shellnut filed a Motion for Leave to Amend Pleadings, Motion for New Trial, Reconsideration, and Request for Ruling on Objections on February 20, 2015.

Wells Fargo moved to dismiss their live counterclaims. On April 30, 2015, the trial court granted Defendant's Motion for Summary Judgment. On that same day, the trial court signed an order granting U.S. Bank National Association's Motion to

Dismiss Counterclaim Without Prejudice.  On June 12, 205, the court denied all of Shellnut's motions and requests.  On June 24, 2015, Shellnut filed his Notice of Appeal with the trial court.

## SUMMARY OF THE ARGUMENT

Wells Fargo knew no later than June of 2010 that without doubt the investor on the Note would not modify Shellnut's Note to reduce his monthly payment, yet it did not inform Shellnut of that fact until August of 2012.  Instead Wells Fargo continued to send letters to Shellnut stating that he may be eligible for a loan modification if he fills out loan modification applications and to sends in supporting documents.  Wells Fargo stated it would review what he sent in and at various points told him the application for a modification had advanced to underwriting.  This went on through August 2012.  Wells Fargo argues in its Motion for Summary Judgment that all of these claims relate to the Note and Deed of Trust and sound in contract alone and are thus barred by the statute of frauds or the economic loss rule.  Wells Fargo argues it had no duty of any kind other than those created in the contract.  Shellnut argues that Wells Fargo had an independent duty to fully disclose the status of his loan modification and that his loan was not eligible to be modified to lower his monthly payment, which is what he was requesting.  Had he known, Shellnut would have taken a different course of action that could have captured some of his equity, avoided two years of negative credit

reporting that caused or at least contributed to the loss of his job and avoid the mental anguish he suffered during this drawn out process. When Shellnut contacted Wells Fargo's loss mitigation and was told he was in underwriting, this was misleading, and possibly completely untrue. Shellnut took this to mean that he was going to get a modification that would lower his monthly payment, underwriting was just determining what the numbers would be. This conclusion is not unreasonable given that he had been clear that is the assistance he needed and was requesting.

Shellnut contends that failing to disclose his loan's ineligibility for a reduced monthly payment, while continuing to solicit him for a loan modifiction constitutes a violation of Texas Debt Collection Act (TDCA) and fraud by non disclosure. The continued written and verbal representations to Shellnut that he was being reviewed for a modification that could result in a reduced monthly payment, when he was not eligible, in 2010, 2011, and more than half of 2012 constitute Negligent Misrepresentations. Additionally, Shellnut's summary judgment evidence shows Wells Fargo's accounting system contained errors regarding the amount Shellnut actually owed beginning in 2010. These errors included or resulted from being charged taxes that were not in fact paid by Wells Fargo in 2010; claimed advanced insurance premiums made by Wells Fargo, made without notice, when Shellnut had already paid for his insurance; and inconsistent claims regarding

claimed missed payments or reinstatement amounts. Wells Fargo claims because Shellnut admits initially missing payments in 2010, that Shellnut was the first party to breach and cannot sue for breach of contract, even though Shellnut resumed paying through February of 2011 and the parties treated the contract as continuing. These errors also support claims for TDCA violations as Wells Fargo threatened foreclosure over fees and debt that was not owed.

Shellnut disputes that Wells Fargo met its burden of conclusively establishing these affirmative defenses. Neither did Wells Fargo prove that no genuine issue of material fact exists and that it was entitled to judgment as a matter of law. The trial court made an error in granting the traditional motion for summary judgment as there are material facts in dispute and the case should be remanded for further proceeding.

Lastly, Shellnut alleges that the trial court abused its discretion in denying Plaintiffs motion to compel Wells Fargo's responses to interrogatories and in granting in part Wells Fargo's protective when Wells Fargo is relying on these alleged policies and procedures as support that it properly handled Shellnut's account through loss mitigation.

### De Novo Standard

Summary judgment is reviewed de novo on appeal. *Fort Worth Star-Telegram v. Street*, 61 S.W.3d 704, 708 (Tex. App.—Fort Worth 2001, pet. denied); *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When reviewing a summary judgment, the appellate court must take as true all evidence favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor. *Fort Worth Star-Telegram*, 61 S.W.3d at 708; *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). The court will consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 280 S.W.3d 844, 848 (Tex. 2009). The court will indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff's cause of action cannot be established. *Fort Worth Star-Telegram*, 61 S.W.3d at 708; *Elliot-Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999). To accomplish

this, the defendant-movant must present summary judgment evidence that negates an element of the plaintiff's claim. Once this evidence is presented, the burden shifts to the plaintiff to come forward with competent controverting evidence of a genuine issue of material fact with regard to the element challenged by the defendant. *Fort Worth Star-Telegram*, 61 S.W.3d at 806; *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant-movant must present summary-judgment evidence that conclusively establishes each element. *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008).

The scope of review from a summary judgment is limited. The court may not consider on appeal issues not expressly presented to the trial court by written motion, answer, or other response. Tex. R. Civ. P. 166a(c); *Fort Worth Star-Telegram*, 61 S.W.3d at 708; *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The motion for summary judgment must state the specific grounds on which judgment is sought, and a summary judgment may not be granted on grounds not raised by the movant in his motion. Tex. R. Civ. P. 166a(c); *Fort Worth Star-Telegram*, 61 S.W.3d at 708; *McConnell v. Southside*

*Indep. Sch. Dist.*, 858 S.W.2d 337, 339 (Tex. 1993).

### *Abuse of Discretion Standard*

The court applies an abuse of discretion standard to a trial court's ruling on a motion to compel or in whether to allow amendments to a pleading. *Dozier v. AMR Corp.*, 2-09-186-CV, 2010 WL 3075633, at \*2 (Tex. App.—Fort Worth Aug. 5, 2010, no pet.); *Austin v. Countrywide Homes Loans*, 261 S.W.3d 68, 75 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *Perez v. Embree Const. Group, Inc.*, 228 S.W.3d 875, 883 (Tex. App.—Austin 2007, pet. denied).  The court does not substitute its judgment for that of the trial court, but instead must determine whether the trial court's action was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.  *Dozier*, at \*2; *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004).  The test is whether the trial court acted without reference to guiding rules or principles.  *Dozier*, at \*2; *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004).  An appellate court must uphold the trial judge's evidentiary ruling if there is any legitimate basis for it.  *Dozier*, at \*2; *Owens-Corning Fiberglass Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

**A. Wells Fargo Failed to Establish as a Matter of Law that the Statute of Frauds Bars Shellnut's Claims for Breach of Contract, Fraud, TDCA, or Negligent Misrepresentation**

To prove the affirmative defense of statute of frauds Wells Fargo must prove with summary judgment evidence that the contract sought to be enforced falls within the statute of frauds and that the contract was not in writing or signed by the defendant. *See* TEX. BUS. & COM. CODE §§ 2.201, 26.01; *Haase v. Glazner*, 62 S.W.3d 795, 797 (Tex. 2001). Wells Fargo in its motion for summary judgment argues that any oral statements, letters sent by Wells Fargo, or omissions of information, no matter the content, that relate in any way to the terms or modification of a written loan agreement fall within the statute of frauds and there can be no cause of action for fraud, no violation of the TDCA, or any negligent misrepresentation. (CR 346–47).

**1. Breach of Contract-**

**Shellnut's summary judgment evidence establishes, at a minimum, disputed issues of material fact exist regarding who was the first party to materially breach the loan agreements and statute of frauds is irrelevant to this issue.**

The statute of frauds cannot bar the breach of contract claims related to Wells Fargo's breach of the loan agreement because the subject contract is in writing and signed. Wells Fargo's primary argument related to Shellnut's summary judgment

evidence of breach of contract is that he did not plead breach of the loan agreements with sufficient particularity to put it on notice. (CR 621). Wells Fargo alternatively argues that there is no summary judgment evidence supporting breach of contract because the Shellnut's evidence and allegations are contradictory in that Shellnut did not send in sufficient payment to reinstate, admits missing a payment in 2009, and is trying to shift the burden to Wells Fargo to disprove a "myriad of alleged breaches." (CR 625–26). As stated, above, Wells Fargo bears the burden of proof for its motion for summary judgment on all issues, including breach of contract.

### a. Fair Notice Pleading

Shellnut's original petition provided fair notice of his breach of contract claims against Wells Fargo. Shellnut is required to do nothing more in his live pleading than give Wells Fargo fair notice of the issues in dispute. *See Horizon v. Auld,* 34 S.W.3d 887, 897 (Tex. 2000). When a party fails to specially except, courts should construe the pleadings liberally in favor of the pleader. *See Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993). Texas follows a "fair notice" standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *See Broom v. Brookshire Bros., Inc.,* 923 S.W.2d 57, 60 (Tex. App.—Tyler 1995, writ denied). To the extent Wells Fargo's motion for summary judgment was based on

Shellnut's pleadings, the Court should assume all allegations and facts in Shellnut's pleadings are true, make all inferences in Shellnut's pleadings in his favor, and ensure that any defects that do exist in the pleadings cannot be cured by amendment. *See Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994); *Medina v. Herrera*, 927 S.W.2d 597, 602 (Tex. 1996); *In re B.I.V.*, 870 S.W.2d 12, 13 (Tex. 1994).

Shellnut's original petition, sections 17, 19, 20, 22, 22, 30, 71 83, 87, 88, 92 and 96 provide fair notice to Wells Fargo that Shellnut was suing Wells Fargo because he was being improperly billed, assessed improper fees, charges etc. (CR 5–48). Of note, Shellnut specifically states, he tendered payment sufficient to bring the account current, ASC demanded payments of fees not due or authorized, did not bring the account current or properly credit payments. (CR 33–34). To the extent summary judgment could have been granted due to a pleading issue it could have been cured by amendment. When, as here, the non-movant's pleadings are insufficient because they fail to state a cause of action, and no special exceptions to such pleadings have been presented to the trial court for a ruling, a motion for summary judgment granted by the trial court will be reversed and remanded to allow the non-movant an opportunity to amend his pleadings. *See Tex. State Dep't of Corrs. v. Herring*, 513 S.W.2d 6, 9–10 (Tex. 1974); *Billstrom v. Mem'l Med. Ctr.*, 598 S.W.2d 642, 647 (Tex. Civ. App.—Corpus Christi 1980). To the extent

any of the other claims were dismissed due to a pleading issue, the same arguments and standards apply and Shellnut requests the Court reverse the summary judgment and remand for further proceedings.

### b. Disputed Material Facts

The Summary judgment evidence establishes issues of disputed material fact as to which party materially breached first or who caused the material breach. The elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach. *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 758 (Tex. App.—El Paso 2000, no pet.). A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform. *Case Corp. v. Hi-Class Bus. Sys. Of Am., Inc.*, 184 S.W.3d 760, 769–70 (Tex. App.—Dallas 2005, pet. denied).

A material breach by one party to a contract can excuse the other party from any obligation to perform. *Henry v. Masson*, 333 S.W.2d 825, 835 (Tex. App.— Houston [1st Dist.] 2010, pet. denied). However, the question of whether a party's breach renders the contract unenforceable—the materiality of the breach—is a question of fact. *Cont'l Dredging, Inc. v. De–Kaizered, Inc.*, 120 S.W.3d 380, 394–95 (Tex. App.—Texarkana 2003, pet. denied).

It is well established under Texas contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. *Henry*, 333 S.W.2d at 840 (citing *BFI Waste Sys. of N. Am. v. N. Alamo Water Supply Corp.*, 251 S.W.3d 30, 30–31 (Tex. 2008)). However, if the non-breaching party continues to insist on performance by the party in default after the breach occurred, "the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties." *Henry*, 333 S.W.2d at 840 (citing *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887 (Tex. App.—San Antonio 1996, writ denied) (quoting *Houston Belt & Terminal Ry. v. J. Weingarten Inc.*, 421 S.W.2d 431, 435 (Tex. Civ. App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.))). If this occurs, the non-breaching party has two options: continuing performance under the contract or ceasing to perform. *Gupta v. Eastern Idaho Tumor Institute, Inc.*, 140 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). That choice only impacts whether the non-breaching party is required to fully perform after the breach. *Id.* at 757. If the non-breaching party treats the contract as continuing after the breach, that party is deprived of any excuse for terminating his own performance. *Henry*, 333 S.W.3d at 840.

If the non-breaching party seeks to benefit from the contract after the breach, that action operates as a conclusive choice, which then denies that non-breaching party of an excuse for his non-performance. *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982). Further, if the non-breaching party elects to treat the contract as continuing after the breach and continues to demand performance, then that party also obligates itself to full performance. *See Long Trusts v. Griffin*, 222 S.W.3d 412, 415–16 (Tex. 2007) (holding that by claiming as damages share of lawsuit recovery, which was benefit of bargain, non-breaching party treated oil and gas operating agreement not as terminated but as continuing and thus "could not cease to share in the expenses and still insist in sharing in the recovery"); *See also Hanks,* 644 S.W.2d at 708 (holding that by choosing to treat contract for sale of business as continuing after other party's breach of covenant not to compete and by retaining all assets of business and continuing its operation, non-breaching party waived any right it had to partially rescind contract); *See also Gupta,* 140 S.W.3d at 757–58 (holding that when non-breaching party elected to treat joint venture agreement in full force and effect after alleged breaches at beginning of agreement and continued to demand performance of opposing party, party's failure to comply with agreement was not excused).

The Court's primary concern in construing a written contract is to ascertain the parties' true intent that is expressed in the instrument. *Coker v. Coker*, 650

S.W.2d 391, 393 (Tex. 1983). The Court must consider the entire contract to give effect to all provisions so that none are rendered meaningless, and it is only when a court can give a definite legal meaning to a written instrument that the contract is construed as a matter of law. *Id.*

The trial court should not have decided the issue of who materially breached the contact first because the summary judgment evidence was in dispute on that issue. Wells Fargo claims Shellnut defaulted in February 2010. (CR 344). However, the summary judgment evidence also shows that Shellnut made loan installment payments through February 2011. (CR 528). Taken together, this would mean that Wells Fargo at most established Shellnut was late in making his February 2010 payment and that Wells Fargo elected to continue accepting payments, which would not establish that Shellnut materially breached in February 2010. Wells Fargo did not present any uncontroverted summary judgment evidence that Shellnut remained in breach or in default throughout 2010 when it began having account errors regarding claimed advanced taxes and insurance; therefore, Wells Fargo has not met its burden in disproving at least one required element of Shellnut's breach of contract claim or establishing an affirmative defense as a matter of law.

Wells Fargo's arguments in its Motion for Summary Judgment on Shellnut's contract claim also focuses on its mistaken contention that Shellnut asserts he is

entitled to a loan modification. (CR 345–46). However, Shellnut has never asserted that he was entitled to a loan modification. Here, the Note and Deed of Trust establish the parties' contractual rights and duties. The summary judgment evidence establishes that Shellnut paid all payments on his account through January 2011. (CR 524). The summary judgment evidence also establishes that Wells Fargo treated the contract as continuing after Shellnut's missed payments and that Shellnut continued to send payments in 2010 while at the same time requesting a reinstatement figure. (CR 494). Wells Fargo, through its attorney, provided a document on multiple occasions entitled "Reinstatement Quote," but the Quotes expressly state in bold that they "are subject to final verification" and that Wells Fargo expressly "reserves the right to collect additional amounts." (CR 552–54). Wells Fargo refused to verify that if Shellnut paid by the date listed it would reinstate his account. (CR 570–72). The parties dispute the legal requirements of the DOT as to each party. Shellnut contends sections 4 and 14 of the DOT require Wells Fargo to give Shellnut a ten-day written notice and opportunity to cure before it pays any taxes or liens that Wells Fargo determines could attain priority over its security interest. (CR 507, 512). Shellnut also contends that section 18 requires Wells Fargo to confirm the amount in writing that Shellnut needed to pay to be fully reinstated. (CR 513). Wells Fargo disagrees and contends that the "Reinstatement Quotes" it sent were sufficient despite the

facts that they stated there could be additional fees and that its customer service representative stated that paying the amount listed would stop the foreclosure, but not necessarily reinstate the account. (CR 552, 553, 554). Mrs. Shellnut attempted to verify the numbers in the June 20, 2011 Reinstatement Quote by calling Wells Fargo for information and at least part of that call was recorded and transcribed. (CR 553, 563–68). Wells Fargo was unable to provide any details regarding the makeup of the reinstatement quote, so customer service tried to help by calling Barrett Daffin and after multiple transfers the Wells Fargo employee comments that "these do not want to help people out." (CR 567). Another call transcript is included as an example of what Shellnut went through seeking to confirm that information from Barrett Daffin was correct where he went through the process of trying to verify the reinstatement quote but ended in the Wells Fargo employee refusing to verify the amount. (CR 568–72). Shellnut believed there were account errors, tried to get a true reinstatement quote, and requested confirmation in writing that when paid the account would be reinstated, but could not get the amount and did not pay. During the litigation, more than a scintilla of evidence was gathered that shows as early as January 4, 2010, Wells Fargo was assessing fees not owed by Shellnut and demanding reimbursement for the wrong amount of money. (CR 594). Taken as true, then Wells Fargo never was never correct with its

reinstatement figures and Shellnut was correct in challenging them and refusing to pay without Wells Fargo verifying what the figures were made up of.

The summary judgment evidence shows that as of August 7, 2012, Wells Fargo claimed Shellnut was past-due on his account a total of $51,161.69, including at least $18,478.66 attributed to fees that include "Miscellaneous Escrow Disb," taxes, insurance, inspections, title, and others fees, many of which Wells Fargo allegedly advanced in 2010.  (CR 524, 594).  Wells Fargo lists fees for taxes, but Tarrant County's tax records for Shellnut's Property contradict Wells Fargo's records and there is at least a $2,000.00 discrepancy. (CR 545, 587, 588, 592, 594). This discrepancy in tax payments began in 2010 and a genuine issue of material fact exists regarding what Shellnut actually owes because Wells Fargo has been threatening foreclosure since at least June 2010 if Shellnut did not pay this incorrect amount. (CR 581).

Further, comparing Plaintiff's summary judgment Exhibits 13, 14, and 21 show another clear example of Wells Fargo's accounting errors and contractual breaches that create issues of material fact relating to Shellnut's lack of continued performance in 2011 and TDCA claims.  (CR 581–84, 593–95).  Plaintiff's Exhibit 13 shows that Wells Fargo told Shellnut that as of May 23, 2010, his total account delinquency was $2,436.92, but less than one month later, on June 11, 2010, Wells

Fargo told Shellnut that he owed $13,198.07, which is in the claimed modification offer for which Wells Fargo told Shellnut he was being considered (CR 581–84).

Wells Fargo's offered "Modification" claims that as of June 2010, Shellnut owed approximately $9,000.00 in unpaid escrow fees that Wells Fargo was going to add to Shellnut's principal balance. However, that figure is expressly contradicted by Wells Fargo's own "accounting" of Shellnut's loan, which shows that as of June 2010, Wells Fargo only paid $1,589.48 in escrow advances. (CR 593–95). There is further no written notice to Shellnut that Wells Fargo was going to make any of these advancements. The summary judgment evidence presented shows that since at least June 2010, Shellnut's account contained errors regarding the amounts demanded by Wells Fargo and the amounts allegedly paid by Wells Fargo on Shellnut's account.

Related to Wells Fargo's failure to accurately keep track of Shellnut's payments, Wells Fargo breached the deed of trust contract when it paid Shellnut's insurance and taxes without first sending Shellnut written notice with an opportunity to cure. This assumes Wells Fargo actually paid the insurance and taxes as claimed, which Shellnut does not concede. Shellnut is required to pay all taxes and any other type of fee that can acquire priority over Wells Fargo's security interest in the Property. (CR 507–08). If Shellnut does not pay those fees, the Deed of Trust allows Wells Fargo to advance funds to pay any lien, which

would include tax liens that might attain priority over its security interest after it sends Shellnut a written notice giving ten days to take a specific set of actions. (CR 507). Wells Fargo can only obtain insurance on the Property and bill it to Shellnut's account if Shellnut fails keep his own insurance on the property. (CR 508). Wells Fargo did not file any summary judgment evidence showing the trial court that Shellnut did not maintain his own insurance during the relevant periods of time or that Wells Fargo sent Shellnut a notice with ten days to cure before paying his taxes or insurance or that it actually made the payments reflected. Thus, issues of material fact exist regarding Wells Fargo's breach of contract and the validity of the fees it charged to Shellnut.

Shellnut attached summary judgment evidence in support of each element for his breach of contract claim. Shellnut performed, or tendered performance, through at least January 2011. (CR 494–97, 498–502, 503–21, 522–31). Wells Fargo breached the loan contracts, which was evidenced by the attached summary judgment evidence. Shellnut's only breach alleged by Wells Fargo is missed payments. Wells Fargo representative Maynhia Her stated under oath on August 7, 2012, that Shellnut failed to make his installment payment due for February 2011 and that as of August 8, 2012, the amount required to cure default by Shellnut was $51,161.69. (CR 528). Thus, any payment related issue in 2009 or 2010 would be a late payment issue, not a missed payment, leaving an issue of material fact

concerning whether Wells Fargo materially breached first in 2010 when it began making errors in applying and keeping track of Shellnut's payments, or assessing charges or fees that were not owed, as early as May 2010. (*Compare* CR 581 (showing a total delinquency of $2,436.92 as of May 23, 2010); CR 583 (claiming that $13,198.07 was past due as of June 11, 2010); CR 585 (showing $2,795.76 was past due as of August 15, 2010); and CR 594 (showing as of November 2010 only $3,102.48 had been advanced).) Thus, in making every inference in Shellnut's favor, the trial court should have denied summary judgment and this court should reverse and remand for further proceedings.

### 2. The Statute of Frauds is inapplicable to Shellnut's Fraud Claim

Shellnut's fraud claim is essentially that if Wells Fargo is going to send letters to Mr. Shellnut stating that he might be eligible for a loan modification if he fills out the application and submits all of the requested supporting documents, then Wells Fargo had a duty to fully disclose and inform him once it knew his loan was not eligible for modification. Shellnut made decisions leading to significant financial harm and mental anguish that he would not have made had Wells Fargo disclosed in 2010 that his loan was not eligible for a loan modification. Wells Fargo in its reply brief argues not only that because the complained of conduct relates to a loan the statute of frauds bars any claim for this type of conduct, but

also that no such misrepresentation occurred because Shellnut was being reviewed or was eligible for a modification.  (CR 626).

The summary judgment evidence shows that Wells Fargo noted Shellnut as prequalified for modification on November 23, 2009, but then on February 9, 2010, Wells Fargo determined that per investor guidelines it could not change the interest rate, could extend the maturity date to January 31, 2037 (10 months beyond the original maturity date of March 1, 2036 (CR 364)), and could cap everything. (CR 597).  The Shellnuts' eligibility was based on the type of their loan rather than financial information, as none had been provided as of February, 16, 2010.  (CR 612). On June 8, 2010, Wells Fargo notes that after a review of the financials that Shellnut had a surplus in the amount of $451.71 and that Shellnut did not have the ability to support an "RPP" (presumably a repayment plan).  (CR 596).  A second note stated that per the investor guidelines Wells Fargo could not reduce a fixed rate, could not reduce "ARM" rate, and could extend maturity date only to January 31, 2037.  (CR 596).  When questioned about this issue, the Wells Fargo corporate representative stated that Shellnut was ineligible for the potential June 8, 2010 modification.  (CR 602).  The representative agreed that Wells Fargo knew that Shellnut was requesting a reduced payment amount but did not know if he was ever actually being considered for that type of modification or if it was even available.  (CR 603–04).  The representative could not identify what

corporate policies were in 2010, but affirmed that in 2012 Texas Cash-Outs could not be modified. (CR 605–06). The representative also stated that whether Shellnut was or was not eligible for a loan modification in 2010 is moot because he asked for help and every time a borrower asks for help Wells Fargo sends out the same letter and allows the borrower to be reviewed again—regardless of eligibility. (CR 607). When asked if Wells Fargo should have told Shellnut he was not eligible for, the corporate representative stated that (1) Shellnut was told in 2012, and (2) there was no reason to tell him before 2012. (CR 607–08). Even when asked specifically whether a person who has equity should be told that he or she is not eligible for a reduced payment, the representative responded that Shellnut was told that in 2012 and there was no reason to tell him before that. (CR 608).

The corporate representative stated that there was no way for Wells Fargo to determine what Shellnut was being reviewed for from 2009–2012, but that she could not recall ever seeing a Texas Cash-Out loan modified. (CR 609–11). Yet on multiple occasions throughout 2011 and 2012, Wells Fargo updated Shellnut when he called, making false statements of fact specifically telling Shellnut about progress being made on his loan modification—progress that was not in fact being made towards a modification that would reduce his monthly payment. (CR 495, 496, 561, 562, 573, 575–79).

After Wells Fargo contacted Shellnut and offered to review a loan modification application if he would submit one, along with the supporting documents, it had a legal duty as of June 2010 to disclose to Shellnut that his loan was not eligible for reduced monthly payments. A duty to disclose may arise in a commercial context in four situations: (1) when there is a fiduciary relationship between the parties; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; or (4) when one makes a partial disclosure and conveys a false impression. *Citizens Nat'l Bank v. Allen Rae Investments, Inc.*, 142 S.W.3d 459, 477 (Tex. App.—Fort Worth 2004, no pet.). As argued above, this issue is adequately pled to put Wells Fargo on notice, and summary judgment, to the extent it may have been granted related to a pleading deficiency, should not have been granted as no special exceptions were filed and there was adequate notice.

In the case before the Court, Wells Fargo voluntarily disclosed that Shellnut might be eligible for a loan modification that could reduce his monthly payments before determining in February or June 2010 that a Texas Cash-Out was not eligible for a reduced monthly payment, yet failed to tell Shellnut that until August 2012. Wells Fargo obtained new information (ineligibility of the loan) it never shared with Shellnut, who had no independent ability to discover that information

and was relying on Wells Fargo to fully disclose the true status of his application in making decisions concerning his house. Wells Fargo's corporate representative testified that upon review—knowing all of Shellnut's claims—Wells Fargo had no reason to inform him that his loan was not eligible for the reduced monthly payment modification he had been applying for. The statute of frauds is inapplicable because the issue complained of is not that Shellnut did not get a loan modification, but that Wells Fargo waited two years from the date it knew he was not eligible to tell him. During this time, Shellnut was damaged separately from the contract in that he suffered negative credit reporting that caused or contributed to the loss of his job, mental anguish damages, and loss of the accumulated equity in his home. Wells Fargo should have informed Shellnut so he would have the facts necessary to make decisions, like whether to put his house on the market rather than trying for a loan modification.

The *Deuley* case relied on by Wells Fargo in its motion for summary judgment is distinguishable from the case at hand. *Deuley v. Chase Home Finance LLC*, CIV.A. H-05-04253, 2006 WL 1155230 (S.D. Tex. Apr. 26, 2006). Shellnut's claims do not involve an alleged oral modification that he is seeking to enforce, but instead involve Wells Fargo's breach of duty to disclose when it determined that Shellnut was ineligible in 2010 for a reduced monthly payment and made misrepresentations related to account errors regarding what was owed.

The statute of frauds should not be applied here and does not support the dismissal of the above listed claims based on the summary judgment evidence presented to the trial court.

**3. The Statute of Frauds is inapplicable to Shellnut's TDCA Claim**

Wells Fargo asserts that the statute of frauds bars Shellnut's TDCA claim as it seeks to enforce an unenforceable oral agreement. (CR 349). Again, Shellnut's claim is not intended to enforce an oral agreement concerning loan modifications as Shellnut and Wells Fargo never reached a modification agreement. Shellnut's claim is seeking to hold Wells Fargo responsible for its TDCA violations in the course of dealing with Shellnut concerning his mortgage debt. The loan modification letters, statements made in the phone calls regarding the loan modification, the reinstatement quotes that threaten foreclosure and demand payment of an incorrect amount, and the other summary judgment evidence shown above do not relate to oral loan modifications but to false and misleading representations about the nature and amount of the debt. The result of these was the loss of equity in collateral, increased debt to Wells Fargo, mental anguish, and damage to Shellnut's credit that resulted in the loss of his job.

The *Kruse* case relied on by Wells Fargo involves a borrower who seeks to recover damages for a lender's failure to perform an oral promise governed by the statute of frauds. In the case at hand, Shellnut seeks to hold Wells Fargo

accountable for the damages it caused in withholding information related to his ineligibility, as well as the false and misleading statements of fact concerning the amounts due, advances made, type of loan modification Shellnut was being reviewed for, and account errors regarding the total balance. *Kruse v. Bank of New York Mellon*, 936 F. Supp. 2d 790 (2013). Cases that have a more similar fact pattern include: *McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463 (5th Cir. 2015) and *Waterfield Mortg. Co., Inc. v. Rodriguez*, 929 S.W.2d 641, 644 (Tex. App.—San Antonio 1996, no writ); both of which are more fully addressed below.

**4. The Statute of Frauds is inapplicable to Shellnut's Negligent Misrepresentation Claim**

The statute of frauds is inapplicable to the negligent misrepresentation claim because the claim is not based in an unenforceable oral contract. The summary judgment evidence and facts relied on are the same as stated above in the breach of contract and fraud sections. The analysis in *Maginn v. Norwest Mortgage, Inc.* is relevant to this situation. *Maginn v. Norwest Mortgage, Inc.*, 919 S.W.2d 164, 169 (Tex. App.—Austin 1996, no writ). In *Maginn*, the trial court held that the plaintiff's tort claims related to Norwest's contingent loan approval, oral representations that the loan would close and was approved were barred by the statute of frauds because their nucleus was in an unenforceable oral contract. The appellate court disagreed and held that the tort claims were not barred by the

statute of frauds.  The court clarified, stating: "Irrespective of their contract claims, appellants' alternative tort claims do not allege that Norwest contracted to loan them money and then breached that contract.  Instead, appellants allege that Norwest never did agree to loan them money, but negligently misrepresented that it would."  *Id.*  The same reasoning applies here.  Wells Fargo repeatedly misinformed Shellnut—that he was being reviewed for a loan modification, was in underwriting, more documents were needed, and so on—through 2010, 2011, and half of 2012 when it knew by June 2010 that Shellnut's loan was ineligible for a loan modification for monthly payment.

The *Maginn* court relied heavily on the Texas Supreme Court case *Federal Land Bank v. Sloane* in making their decision.  *Fed. Land Bank v. Sloane*, 825 S.W.2d 439 (Tex. 1991).  In *Sloane*, a bank had represented to the plaintiff that it would loan him money, and he incurred expenses relying on this representation. After the bank ultimately denied the plaintiff the loan, he sued it on a negligent misrepresentation theory.  The Court disagreed with the bank's statute of frauds defense explaining, "The Sloanes do not claim that the bank agreed to loan them money and then breached that agreement; rather, they claim that the bank did not agree to loan them money, yet negligently misrepresented that it had made such an agreement."  *Id.* at 442.

Wells Fargo breached its duty by causing Shellnut to incur expenses and damages in relying on representations that his loan was being reviewed for modification and that it was likely to be eligible. When viewed most favorably to the nonmovant, the summary judgment evidence shows that: (1) Wells Fargo represented to Shellnut that it was reviewing his loan for modification; (2) Wells Fargo in fact knew that Shellnut's loan could not be modified; and (3) Shellnut incurred additional fees and late charges, endured mental anguish, and had negative credit reporting that resulted in lost income that would not have occurred if Wells Fargo had fully informed him that the applications he was sending in and the monthly reduction in his loan payment he was waiting on had already been decided on in 2010 by Wells Fargo.

**B. Wells Fargo Fails to Establish as a Matter of Law that the Economic Loss Rule Bars Shellnut's Claims for Fraud, TDCA, or Negligent Misrepresentation**

Wells Fargo asserts in its motions for summary judgment that the economic loss rule bars Shellnut's fraud, TDCA, and negligent misrepresentation claims, but failed to conclusively prove it as a matter of law. Wells Fargo not only falls short of establishing that Shellnut's claims are precluded, but it also fails to fully and properly state the rule. The economic loss rule looks at the nature of both the duties and injuries involved. *Sw. Bell Tele. Co. v. Delanney*, 809 S.W.2d 493, 494 (Tex. 1991); *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors*

*Inc.*, 960 S.W.2d 41, 45 (Tex. 1998). Duties exist at law where there are general obligations apart from any promises made or intentions manifested to avoid injuring others. *Delanney*, at 494. When a defendant would be liable for its conduct regardless of the fact that a contract exists, the plaintiff may have a tort claim; when a defendant would only be liable because a contract did in fact exist, the plaintiff ordinarily only has a contract claim. *Id.* The nature of the injury usually determines which duties are breached, and when the only injury is economic loss to the subject of a contract, only a contract claim exists. *Id.* at 495 (citing *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986)).

Wells Fargo heavily relies on *Delanney*, however it fails to properly apply it to the facts of this case. While the *Delanney* Court limited the plaintiff to a breach of contract claim because the "defendant's duty existed only by virtue of the contract between the parties," the conduct complained of was the defendant's failure to publish plaintiff's yellow pages listing according to their contract. There were no facts pled or alleged harm based on anything not contained in contract to publish the yellow page listing.

Here, Shellnut complains that Wells Fargo's conduct breached duties it would have had with or without a contract in place. The parties agree there was no written contract between the parties that required a loan modification to be offered, for a loan modification to be reviewed, or for Wells Fargo to even consider it, yet it

is also undisputed that Wells Fargo chose to repeatedly send applications for loan modifications to Shellnut or that Shellnut filled them out, sent in financial documents, and that the parties communicated frequently regarding the status of the loan modification. Regardless of any loan contract, Wells Fargo has the same legal duties of care as any stranger to Shellnut and may be held liable for their breach as well as for violations of the TDCA. If a company that was a complete stranger contacted Shellnut stating it offered refinancing services and would consider refinancing Shellnut's loan if he filled out an application, sent in documents regarding his income, represented that it was working with Wells Fargo to determine a pay off, and then represented that it was reviewing the loan, that the modification review had progressed to underwriting, that it was just waiting on Wells Fargo to determine the correct pay off or for an updated financial record, but then it turned out that none of the above was true and there was no communication, then at minimum there is a potential fraud claim, TDCA claim, and negligent misrepresentation claim if Shellnut's reliance was reasonable and if he ultimately suffered damages. The same analysis should apply here, and, because Wells Fargo was the servicer of the Shellnuts' loan, the evidence of his reasonable reliance on what he was told is that much stronger.

Moreover, Shellnut suffered an independent injury as a result of Wells Fargo breaching its duties at law. The economic loss rule bars tort claims when the

injury is nothing more than economic loss related to the performance and subject matter of the parties' contract. *Formosa*, at 45. Shellnut's lost equity, negative credit reporting causing or contributing to his lost employment, mental anguish damages, and other damages as pled were not caused by a breach of contract by Wells Fargo but by the misrepresentations, withheld information, credit reporting and, other conduct of Wells Fargo unrelated to any contractual term.

## 1. Fraud and TDCA—Economic Loss Rule

Wells Fargo failed to conclusively establish that Shellnut's fraud and TDCA claims are barred by the economic loss rule when it relied on conclusory statements and cited to authority that has very little underlying factual connections to his case. Shellnut provided summary judgment evidence listed above that, taken as true, shows Wells Fargo committed fraud and violated the TDCA when it assessed false charges stemming from account errors in Shellnut's account and sought to take possession of the Property through a foreclosure sale based on those false charges. Wells Fargo also intentionally or recklessly misled Shellnut by sending modification applications to him asking that he fill them out and indicating he could receive a loan modification that could lower his monthly payment based on his financial status, all the while knowing he had been determined ineligible in 2010. Further, Shellnut's resulting loss of equity, mental anguish damages, loss of income from negative credit reporting, and disclosures made to his employer

causing or contributing to his job loss are independent injuries not based on the performance of the contract, but caused by Wells Fargo's actions, statements, and decisions to withhold information from Shellnut that were not covered by the Note and Deed of Trust, or relating to any duties or obligations created by the Note and Deed of Trust.

The Fifth Circuit recently analyzed a very similar situation in the *McCaig* case when it determined the economic loss rule did not apply and upheld an approximate $300,000.00 verdict against Wells Fargo resulting from "mistakes" made by Wells Fargo in servicing the McCaigs' loan that were found to be violations of the TDCA and breach of contract. *McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463 (5th Cir. 2015).

The Fifth Circuit stated: "If Wells Fargo violated the TDCA, it can be held liable for those violations even if there are contracts between the parties, and even if Wells Fargo's prohibited conduct also amounts to contractual breach. A statutory offender will not be shielded from liability simply by showing its violation also violated a contract." *Id.* at 475. The Fifth Circuit specifically notes that the TDCA contemplates that there will often be contractual duties between the consumer and debt collectors, but that even between contracting parties there can be independent

duties. *Id* at 474–75.[1] The analysis for the TDCA claims is equally applicable to the fraud claims.

The above cited summary judgment evidence, taken as true, shows Wells Fargo withheld from Shellnut its 2010 determination of his ineligibility for the modification he was applying for through 2012 and waiting to hear back on, and also during that time, Wells Fargo made account errors that led to it seeking to collect improper amounts from Shellnut. Wells Fargo attached no summary judgment evidence to its Motion for Summary Judgment explaining the discrepancies in the written communications sent to Shellnut and the information filed by Wells Fargo in the foreclosure application or contained in the Tarrant County tax records that could support dismissal by summary judgment.

Wells Fargo relies on *Heil Co. v. Polar Corp.* in its Motion for Summary Judgment for support that the economic loss rule precludes fraud claims, but fails to address that the opinion by the Court in that case was very fact determinative and those facts are much different than the facts presented in this case. *Heil Co. v. Polar Corp.*, 191 S.W.3d 805 (Tex. App.—Fort Worth 2006, pet. denied). In *Heil*,

---

[1] *See also* Breach of "an independent legal duty, separate from the existence of the contract itself," represents a particular situation where tort claims (based on that independent duty) may co-exist with contract claims (based on a breach of the contract). *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998). "Thus, a party states a tort claim when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.,* 445 S.W.3d 716, 718 (Tex.2014).

the plaintiff's complaints were for conduct specifically subject to the contract, and the fraud claim's only function was seeking punitive damages. *Id.* at 817. The plaintiff's claims were based on a failure to defend and indemnify as required by the terms of the agreement, but did not concern any other conduct. *Id.* Much like the cases and arguments cited to by Wells Fargo in the *McCaig* case that the Fifth Circuit determined were so factually different as to not apply, the *Heil* case is very different. Shellnut's claims concern Wells Fargo's conduct, omissions, and duties taken on when it made representations relating to processing a loan modification. Once it did that, as shown above, Wells Fargo was taking actions, making representations, and owing Shellnut duties of truth and full disclosure that were outside the scope of the loan contracts. Wells Fargo cites *McDaniel v. JPMorgan Chase Bank* to support its assertion that TDCA claims are precluded by the economic loss rule. *McDaniel v. JPMorgan Chase Bank*, No. 1:12-CV-392, 2012 WL 6114944 (E.D. Tex. Dec. 10, 2012). While the *McDaniel* court did find that the economic loss rule has been applied to misrepresentations where actions taken by a lender were wrongful only because they violated the agreement, this case is distinguishable. The court explained that a plaintiff cannot recover under tort when the deed of trust governs the conduct allegedly violating the TDCA. *Id.* at *7. In that case, the complaints concerned payments and consequences of non-payment governed by the deed, whereas Shellnut complains of false or misleading

representations regarding the status of a loan modification that could result in a lower monthly payment—that is, false representations regarding progress being made in the review as the same time as account errors were being made that caused damage to Shellnut as listed. These actions—not covered by the loan contracts—constitute TDCA violations as pled. Stated another way, Wells Fargo paid taxes and insurance without notice to Shellnut, in violation of the notice provisions in the Deed of Trust. This breach of contract did not harm Shellnut, but what harmed Shellnut is that Wells Fargo then filed foreclosure proceeding attempting to collect debt not owed, misrepresented that debt to the court and Shellnut, and was simultaneously representing to Shellnut in letters and over the phone that loss mitigation was reviewing him for a loan modification. Wells Fargo went on to represent that Shellnut's application had advanced to underwriting and that he just needed to send in updated financial info to move forward, all the while knowing he could never qualify for a reduced monthly payment. These failures to disclose the whole truth, misrepresentations regarding progress of the loan modification, prolonged negative credit reporting, and attempts to foreclose based on inaccurate account information are what harmed Shellnut and constitute fraud and TDCA violations whether or not there was a contract. These actions are tortious even if committed in the absence of a loan agreement.

Even if Shellnut's first missed or late payment gave Wells Fargo a right to seek foreclose under the Loan Agreement following Shellnut's breach, a contractual right to foreclose on a property does not completely shield a debt collector from liability under the TDCA. *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 869–70 (Tex. App.—Dallas 2008, no pet.). Liability for violations of the TDCA can be based on both "the right to" collect and the "manner in which the right is exercised." *Id.* Regardless of any contractual right to foreclose created by the Loan Agreement that Wells Fargo might have had, Wells Fargo violated the TDCA by falsely representing that there was a way out of this situation through a loan modification that, even in 2010, it knew could not lower a monthly payment. Wells Fargo's policy is not to tell the borrower when it is determined that a loan is not eligible; instead, its policy is to keep sending out loan modification application solicitations and requests for financial information even when the relief requested has been denied and will not change. The determination in February 2010 was made not based on Shellnut's financial information that could change, but on the fact that he had a Texas Cash-Out loan, something that was never going to change. The trial court erred in dismissing Shellnut's fraud and TDCA claims based on the economic loss doctrine as the conduct complained of related to the manner of collection and violations of the independent duty of disclosure and caused

damages, including mental anguish and lost income, that are not breach of contract damages, but tort damages.

Wells Fargo cites to the *Chavez* case that stated, " We do not condone Wells Fargo's conduct as alleged, but terrible customer service is not automatically the equivalent of "deceptive means." We have previously held that statements regarding loan modifications do not concern the "character, extent, or amount of a consumer debt" under section 392.304(a)(8)" and that to maintain a claim under section 392.304(a)(19), a borrower would need to allege that Wells Fargo made an "*affirmative statement* " that was false or misleading. *Chavez v. Wells Fargo Bank, N.A.,* 578 Fed. Appx. 345, 348 (5th Cir. 2014). While there was certainly poor customer service, Shellnut's summary judgment evidence does not just allege or allude to claimed vague claimed "not to worry" type statements as alleged in *Chavez,* but cites to Wells Fargo's internal notes, records and recorded calls showing that Shellnut was told he was in underwriting, that Wells Fargo was requesting that he send in additional financial information, when due to his loan type he was never going to be approved, which was all going on at the same time as Wells Fargo's account errors causing the compute generated demands, account statements and other correspondence sent to Shellnut to have in correct balances or demand payments for claimed advances that were either not made or should not have been made. These facts are actionable under the TDCA and for Fraud.

## 2. Negligent Misrepresentation

**a. The negligent misrepresentations shown in the summary judgment evidence were based**
  **on duties not created by contract and caused economic and non economic harm.**

Wells Fargo failed to conclusively establish that the economic loss rule bars Shellnut's negligent misrepresentation claim. Wells Fargo has not proven that it did not have an independent duty of care or that its negligent misrepresentation did not cause Shellnut a separate injury.

Wells Fargo relies on *Rivera v. Bank of America* to establish that the economic loss rule bars a negligent misrepresentation claim if the borrower cannot demonstrate that the lender owed any duty independent of a note and security instrument. *Rivera v. Bank of America, N.A.*, No. 4:13-CV-195, 2014 WL 2996159, at *7 (E.D. Tex. July 3, 2014). In this case, however, Wells Fargo, when it chose to offer loan modification as an option to Shellnut, owed Shellnut an independent duty—a duty to use reasonable care in providing information to customers or potential customers, a duty of full disclosure, a duty to correct information previously disclosed once it determined Shellnut's loan could not be modified, making prior representations misleading. *See Citizens Nat'l Bank* at 477; *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). Wells Fargo had a separate legal duty of care; therefore, Wells Fargo has not proven

that Shellnut's negligent misrepresentation claim should be dismissed as a matter of law and dismissal of this claim in summary judgment was improper.

The court's holding in *Rivera* that the plaintiffs' complaints relating to the parties' contractual relationship under the terms of the note and security instrument could not form the basis of a negligent misrepresentation claim is inapplicable because Shellnut's claims relate to Wells Fargo's representations during the modification application process, a process that was specifically not under the terms of the Loan Agreement. Because Wells Fargo's conduct complained of is unrelated to the loan contracts and caused Shellnut injury, including mental anguish damages, the economic loss rule does not bar his negligent misrepresentation claim as a matter of law alleged in the motion for summary judgment. *Rivera*, at *7.

**b. Wells Fargo Failed to Conclusively Negate One or More Elements of Shellnut's Negligent Misrepresentation Claim and Genuine Issues of Material Facts Exist.**

Under Texas law, the elements of a negligent misrepresentation claim are (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest, (2) the defendant supplies "false information" for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffers pecuniary loss by justifiably relying on the

representation. *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

Wells Fargo asserts that Shellnut's negligent misrepresentation claim fails as a matter of law because such a claim requires proof that the defendant supplied false information for the guidance of others "in their business." As support, Wells Fargo cites cases classifying negligent misrepresentation as a "commercial tort," as well a case where the claim was dismissed for lack of evidence that "the information was supplied for the guidance of others in their business." In reality, none of the cited cases include any discussion of this "in their business" element or what it means. Rather, Wells Fargo is relying on words and phrases taken out of context with no real indication from the deciding courts regarding the "in their business" element of a negligent misrepresentation claim. Case law is somewhat unclear as to where the limits are on this element, however there is more than a scintilla of evidence that Shellnut relied on the negligent misrepresentations in making decisions relating to his business, as Shellnut stated in his affidavit that he relied on the information he was provided in pursuing the loan modification and the misrepresentations led to the loss of his job.[2] Summary judgment should not have been granted on this claim as more than a scintilla of evidence existed

---

[2] *See Burnette v. Wells Fargo Bank, N.A.*, 4:09-CV-370, 2010 WL 1026968, at *7 (E.D. Tex. Feb. 16, 2010), report and recommendation adopted, 4:09-CV-370, 2010 WL 1026969 (E.D. Tex. Mar. 17, 2010) (stating borrower had stated a valid cause of action against lender related to consumer loan modification of borrower's home.

regarding Shellnut making decisions regarding his business based on the representations he received from Wells Fargo and it should be remanded for further proceedings.

**C. The Trial Court abused its discretion in denying Shellnut's First Amended Second Motion to Compel Production of Documents and Interrogatory Responses and in Granting, in part, Wells Fargo's Request for a Protective Order.**

The Trial Court abused its discretion when it denied Shellnut's First Amended Second Motion to compel (Motion to Compel) with regard to interrogatories 4–11, 14, 15, 18, 19, 22 and in Granting Wells Fargo's Protective Order with regard to deposition topics 8–9r, 13, 17 and 23. As the issues surrounding the discovery dispute were briefed in detail to the Trial Court and are somewhat voluminous, Shellnut incorporates all arguments laid out in the Response Objecting to Defendant's Motion for Protective Order (CR 222–44), Motion to Compel and attached Exhibits (CR 253–300) as if laid out in full herein and relies on the arguments and evidence attached in support, all included in the Clerk's Record filed with the Court. As well as the letter brief provided to the Trial Court. (CR 328–29).

The standard of review is laid out above and it is well established that the abuse of discretion standard applies and the Court has jurisdiction to review the Trial Court's order as final judgment was entered as stated above. Shellnut relies on the arguments presented and listed above, but additionally would point out a

few particular arguments and contradictions. Wells Fargo argues in its request for a protective order that Shellnut's request to question the corporate representative regarding differences in home equity loan modifications are irrelevant and that Shellnut should not be allowed to get information regarding policies and procedures, yet in the deposition the Corp. Rep. gives testimony about how she relies on policies and procedures and how they are different for Texas Cash out loans in her explanation and justification for how Shellnut's loss mitigation file was handled. (*Compare* CR 189–90 and 605–06).

Despite the Corp. Reps. clear reliance on Wells Fargo's policies and procedures in her deposition testimony, Well Fargo argued to the Trial Court at length and specifically in its affidavit in support of its response to the Motion to Compel (CR 325) and in its request for protective order (CR 205–09) that the information requested in the above listed interrogatories and deposition topics was overly burdensome to gather and further were protected trade secrets. At a minimum the policies and procedures that were specifically used by Wells Fargo to guide its employees who dealt with Shellnut should have been ordered to be produced based on the exhibits and argument presented to the Trial Court.

In addition to the arguments laid out in the Motion to Compel filed with the Trial Court, Shellnut would point out some factual statements made by Wells Fargo's Corp. Rep that were not available at the time the Motion to Compel or

Response to the Motion for Protective Order were filed. Of note Ms. Brooke Bosier testified that:

a. She didn't know when a loss mitigation department was created in Texas; (CR 601)

b. When the loss mitigation department was created that handled Shellnut's applications or whether or not loan modification applications were being submitted but no department had yet been created to review them; *Id.*

c. Wells Fargo's policy for Texas cash out refinance in 2012 was that we would only give repayment plans; (CR 605)

d. Wells Fargo might have had a different policy in 2010, but she didn't know it or if there was a way to determine what Wells Fargo's policy was; (CR 605–06)

e. She trusts and relies on the 2010 policies and procedures without knowing what they are; (CR 606)

f. She did not see violations of policies and procedures; (CR 610)

The arguments and evidence cited to in the Motion to Compel and the Response to Wells Fargo's Request for Protective Order, in addition to the deposition testimony cited to above show that the requested topics and interrogatories were in fact relevant, reasonably limited in the scope and each requested information regarding disputed facts and topics with sufficient specificity as to require Wells Fargo to answer under the Texas Rules of Civil Procedure and the Trial Court abused its discretion in not allowing Shellnut access to this information. Shellnut requests that upon remand of the above causes of action this Court issue additional instructions for the Trial Court regarding,

modifying the Trial Court's order on the Motion to Compel and Protective Order, CR 333-335.

## CONCLUSION AND PRAYER

Appellant does not challenge the Trial Court's dismissal of the negligent hiring, DTPA and promissory estoppel claims. However, for the reasons set forth above, Appellant, Freddie Shellnut, respectfully requests that this Honorable Court grant Appellant's appeal in full and remand for further proceedings his breach of contract, TDCA, Fraud and Negligent Misrepresentation claims. Shellnut prays that this Court reverse the trial court's judgment and remand this case for further proceedings.

## ORAL ARGUMENT

Appellant requests oral argument be granted as it may shed clarity on the argued distinctions related to the various duties owed, regarding the distinctions between the summary judgment evidence showing breach of contract and actions that constitute efforts to collect debt that are actionable regardless of whether or not there is a breach of contract or who defaulted first.

Respectfully submitted,

LAW FIRM OF CALEB MOORE, PLLC
2205 Martin Drive, Suite 200

Bedford, TX 76021
Telephone: (817) 953-2420
Facsimile:   (817) 581-2540
By: */s/ Caleb Moore*
Caleb Moore
cmoore@thedfwlawfirm.com
SBN: 24067779
Attorney for Freddie Shellnut

## CERTIFICATE OF COMPLAINCE

This brief was prepared using Microsoft Word.  Relying on the word count function in that software, I certify that this brief contains 14,598 words.  I certify that this brief is in compliance with Local Rule 1.

*/s/ Caleb Moore*
Caleb Moore

## CERTIFICATE OF SERVICE

I certify that on November 9, 2015, the above was served in accordance with the Texas Rules of Civil and Appellate Procedure on opposing counsel using the Clerk's efiling system:

*/s/ Caleb Moore*
Caleb Moore

## STATEMENT REGARDING APPENDIX

The Appellant is of the opinion that an appendix in this case containing copies of the loan contracts, Trial Court's judgment and other written correspondence would be voluminous and impractical as well as duplicative of the Clerk's Record relied on and cited to and likely not aid the Court.  As such, an appendix has not been created.  If Appellant's opinion is mistaken, he can promptly supplement this brief with an appendix upon receiving notice from this Court.